UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

RODNEY PAMILTON                    CIVIL ACTION NO. 11-cv-1433

VERSUS                             JUDGE FOOTE

WARDEN, AVOYELLES                  MAGISTRATE JUDGE HORNSBY
CORRECTIONAL CENTER

## REPORT AND RECOMMENDATION

**Introduction**

A Caddo Parish jury convicted Rodney Pamilton ("Petitioner") of second-degree kidnapping and aggravated second-degree battery.  He was sentenced to 40 and 15 years, to run concurrently.  His convictions and sentences were affirmed on direct appeal.  State v. Pamilton, 979 So.2d 648 (La. App. 2nd Cir. 2008), writ denied, 999 So.2d 1145 (La. 2009).  Petitioner also pursued a post-conviction application in the state courts.  He now seeks federal habeas corpus relief.  For the reasons that follow, it is recommended that the petition be denied.

**Sufficiency of the Evidence**

**A. The Evidence**

The victim, B.B., testified that she was addicted to crack and often exchanged sex for drugs.  She had done so with Petitioner two or three times without incident until a transaction in April 2005.  B.B. testified that Petitioner picked her up, purchased crack, and took her to a vacant house.  The pair immediately took their clothes off and began to smoke crack.

B.B. said she performed oral sex on Petitioner for about an hour, but Petitioner was unable to maintain an erection.  B.B. wanted to leave, and she pretended to go to the bathroom when she was really making "a run for it."  Petitioner discovered her attempt, and the two had their first altercation.  They ended up falling down a flight of stairs.  Petitioner beat B.B. with his fists and kicked her, and B.B. crawled back up the stairs while Petitioner was "kind of like basically dragging me telling me, I told you, you wasn't going to go nowhere until you perform."  B.B. said she told him to do what he had to do, kill her or whatever, because she was ready to go.

B.B. testified that, during an altercation with Petitioner, he not only hit, stomped, and kicked her, but he also struck her with an object.  She said one was a "ten gallon paint bucket can" that she saw clearly, but it was one of the last things she could see clearly.  She recalled another object and said, "I know it was some kind of glass object whether it was a bottle or what.  That's how I got the cut."  She said she saw both objects being swung at her by Petitioner.

B.B. remained at the house and later engaged in vaginal sex with Petitioner.  She said Petitioner told her that she was not leaving until she performed.  B.B. admitted that she would have stayed voluntarily if there was still crack to smoke, but they had used it all.

The two went their separate ways the next morning.  B.B. went home but could not get her mother to answer the door.  When she went to a neighbor's house, the neighbor saw B.B.'s injuries and called for police and medical assistance.  B.B. was found to have a

lacerated liver, multiple spine fractures, and facial trauma that required stitches.  Her eyes were blackened and swollen nearly shut.  She was in intensive care for three days.

Petitioner waived his <u>Miranda</u> rights and gave a recorded statement to police.  The tape was played for the jury but not transcribed by the court reporter.  The court has located a partial transcript elsewhere in the record. Tr. 13.  Petitioner told police that B.B. grabbed his pants and ran to the door. He went after her. She pushed him near the top of the stairs, and he grabbed her as he fell. They tumbled down the stairs, after which he began hitting her with his fists and "tried to knock her head off."  He told her to leave, but she stayed, and they later had sex.

The officer who took the statement testified that Petitioner also admitted that he "whipped her ass" and "swoll her up" so bad that she looked "like an elephant woman" that spoiled the mood.  Petitioner denied, however, that he beat B.B. with any objects or that she was kept at the house against her will.  The officer testified that Petitioner was asked about a paint can or beer bottle.  He admitted swinging the paint can but denied making contact with it.  When asked about a bottle, he responded by asking if police found one, whether it was broken, and similar questions. He did not actually admit striking B.B. with a bottle. These portions of the interview are not in the transcript, which is noted to be incomplete. Tr. 29.

Police recovered from the scene a glass liquor bottle with what appeared to be a fresh blood smear and a dented, mostly-full paint can.  Neither object was tested for fingerprints or the presence of blood.

Petitioner testified at trial that he purchased drugs, and B.B. voluntarily got in a car and accompanied him to the house where they planned to smoke crack.  They went to a bedroom, got undressed, and began smoking.  Petitioner testified that B.B. voluntarily performed oral sex on him over the hour or more that the drugs lasted.  At one point, according to Petitioner, he put his pipe down and said it was time to do what they came to do.  B.B. did not like that and started telling him to beat her or kill her.  She then walked out the door, and Petitioner noticed his pants were missing.

Petitioner testified that he found B.B. in the kitchen going through his pants.  She turned around and pushed him, which caused him to start falling down the stairs.  He grabbed her as she fell and took her with him.  Petitioner admits that he was upset and began hitting B.B. for a good 20 seconds.  He denied that he used a bottle or paint can.

Petitioner said the two then went back upstairs, but he did not force her or pull her along the way.  Petitioner admitted that he did pick up a paint can and swing it at her so hard that if it would have hit her it "probably would have cracked her skull."  He said the look on B.B.'s face when he missed caused him to calm down, and the two began talking.  He said he told B.B. numerous times to leave, and he never prevented her from doing so.  Petitioner admitted a prior felony drug conviction and "several" battery convictions.

### B. Elements of the Crimes

Kidnapping includes the forcible seizing and carrying of a person from one place to another, or the imprisoning or forcible secreting of a person.  Second-degree kidnapping includes a kidnapping where the victim is physically injured or sexually abused.  La. R.S. 14:44.1.

Battery is the intentional use of force or violence upon another.  Aggravated second-degree battery is a battery committed with a dangerous weapon when the offender intentionally inflicts serious bodily harm.  La. R.S. 14:34.7.  A dangerous weapon includes any instrumentality which, in the manner used, is calculated or likely to produce death or great bodily harm.  La. R.S. 14:2.

### C. Jackson and 2254(d)

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979).  The state appellate court conducted a Jackson analysis on direct appeal and found the evidence sufficient.

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).  Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard.  It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard.  Parker v. Matthews,132 S.Ct. 2148, 2152 (2012).

### D. Analysis

Petitioner argues that the evidence was insufficient to support the second-degree kidnapping conviction because there was conflicting testimony as to whether B.B. was actually imprisoned or forcibly secreted.  B.B.'s testimony squarely supports the elements of the crime.  She voluntarily entered the house but was later forcibly restrained from leaving.  According to B.B., Petitioner told her she was not going to leave until he got satisfaction, and he beat her when she did try to leave.

Petitioner argues that B.B. should not be considered credible, but "under Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995).  "All credibility choices and conflicting inferences are to be resolved in favor of the verdict." Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).  And "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011). Petitioner's credibility argument is simply beyond the scope of what is permitted on review under Jackson, so the state court's decision was not objectively unreasonable.

Petitioner argues that the evidence was insufficient to support the aggravated second-degree battery charge because there was conflicting testimony about whether he used a dangerous weapon.  B.B. did say at one time she did not know whether Petitioner hit her *first* with a paint bucket or a bottle, and she admitted that things got blurry and she experienced blackouts after the beating intensified.  B.B. testified on more than one occasion, however, that Petitioner struck her with a paint can and a bottle.  Petitioner denied this assertion in his testimony, and he claims that B.B. is not credible, but that was a decision for the jury.  The state appellate court properly deferred to the jury's credibility assessment and weight of the evidence under the <u>Jackson</u> standard.  That decision was most certainly not an objectively unreasonable application of <u>Jackson</u>, so this claim lacks merit.

**Excessive Sentence**

The sentence for second-degree kidnapping was not less than five nor more than 40 years.  The trial judge noted the nature of the offense, the life-threatening injuries to the victim, and Petitioner's lengthy criminal history.  Petitioner had only one prior felony conviction, but he had been arrested at least 33 times, many times for felony charges on which he pled guilty to misdemeanors.  His rap sheet of misdemeanor convictions from city court covered 46 pages and included resisting arrest, battery on a police officer, concealed weapons charges, theft, property damage, and trespass accumulated over about 20 years.  One misdemeanor battery conviction stemmed from an accusation that Petitioner beat, dragged, and kicked a woman, then hit her with both a pipe and a crowbar, causing her to lose

consciousness.  He also accrued 59 write-ups in his two years in jail as a pretrial detainee, often for fighting with inmates or batteries against staff.  The judge found that the maximum sentence was essentially mandated by these facts.  Tr. 596-608.

Petitioner's counsel argued on appeal that the imposition of the maximum sentence was nonetheless imposed in violation of state law, La. C.Cr.P. art. 894.1 and Art. I, Section 20 of the Louisiana Constitution.  Tr. 628-631.  The sentences were affirmed.  Petitioner then filed a pro se application to the Supreme Court of Louisiana, but it also limited the sentencing argument to state law.  Tr. 719-20.  His habeas memorandum filed in this court again attacks the sentence as allegedly violating Art. I, Section 20 and related Louisiana jurisprudence.

The habeas statute provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law."  Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011).  Thus, habeas relief is not available on this claim even if Petitioner is correct regarding state law.

Even if Petitioner's arguments were considered to have exhausted and presented a federal claim, the claim would lack merit.  The Supreme Court has upheld a mandatory life sentence for a recidivist whose third felony conviction was obtaining $120.75 by false pretenses and whose prior crimes were similar property crimes.  Rummel v. Estelle, 100 S.Ct.

1133 (1980).  The Court has also upheld a mandatory life sentence without possibility of parole for a conviction of possession more than 650 grams of cocaine, despite a lack of consideration of mitigating factors such as no prior felonies.  Harmelin v. Michigan, 111 S.Ct. 2680 (1991).  The Court in Lockyer v. Andrade, 123 S.Ct. 1166 (2003) denied habeas relief for a state prisoner who was sentenced to consecutive terms of 25 years to life for a third-strike conviction for stealing approximately $150 worth of video tapes.  The sentence did not permit habeas relief because it was not contrary to or an unreasonable application of a clearly established gross disproportionality principle set forth in Supreme Court holdings.  The Lockyer Court admitted that its precedents in the area were not clear, which makes it difficult to obtain habeas relief under the deferential Section 2254(d) standard.

Petitioner was convicted of a serious crime.  It could have been worse for him; the trial judge noted the jury would have been justified in convicting for aggravated kidnapping, which carries a mandatory life sentence.  Petitioner had  a lengthy criminal record and a history of extreme misbehavior that did not warrant leniency.  There is no clearly established federal precedent that would deem a sentence in this case excessive or  disproportionate, so this claim lacks merit.

**Ineffective Assistance of Counsel**

**A.  Introduction**

Petitioner argues that his counsel, Mary Harried, was ineffective because she (1) did not impeach the victim's testimony, (2) did not procure defense witnesses, and (3) proceeded

to jury trial despite Petitioner's earlier waiver of jury trial.  To prevail on one of these claims, Petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

### B.  Habeas Burden

Petitioner's claim was adjudicated and denied on the merits by the state court, so Section 2254(d) directs that the question is whether the state court's determination under the Strickland standard was objectively unreasonable.  Schriro v. Landrigan, 127 S.Ct. 1933, 1939 ( 2007).  The Strickland standard is a general standard, so a state court has a good deal of latitude to reasonably determine that a defendant has not satisfied it.  The federal court's review is thus "doubly deferential."  Knowles v. Mirzayance,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be."  Harrington v. Richter, 131 S.Ct. 770, 786 (2011).  Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system.  Id.  Thus, "even a strong case for relief  does not mean the state court's contrary conclusion was unreasonable."  Id.

### C.  Victim Impeachment

Defense counsel cross-examined B.B. about her drug usage generally and on the day of the events. She also got B.B. to admit that she voluntarily got in the car and went to the

house with Petitioner, she was never tied up, and she did not try to leave at times when Petitioner was asleep.  Tr. 434-39.  Petitioner argued in his post-conviction application that counsel was ineffective because he did not also cross-examine B.B. about earlier statements she gave to police.  See Petition, Exhibits G-I.

Petitioner notes that an early report stated that the victim said she "had been beaten, held against her will, and forcibly raped" by Petitioner.  An officer recorded in another report that the victim said she went with Petitioner to smoke crack but told him that she had to go when she realized he wanted sex in exchange for the drug.  She said Petitioner then told her she was not going anywhere, and he began to beat her when she tried to run.  This report included the allegation that Petitioner used a paint can and a beer bottle in the attack.  The report also included the victim's claim that Petitioner raped her twice.  A couple of months later, the victim gave a recorded statement in which she acknowledged previously exchanging oral sex for drugs with Petitioner.

Petitioner argued that there were enough inconsistencies between these statements and the testimony at trial that counsel should have attempted to impeach B.B. by pointing out the perceived inconsistencies.  Trial counsel filed an affidavit in which she responded to many of the post-conviction assertions of ineffective assistance.  With respect to this issue, counsel said only that she "respectfully disagreed with the assertion that she did not effectively impeach the witness, and she noted that the credibility of a witness was a decision for the jury.  Tr. 813-14.  The trial court denied the claim with a similar observation that a witness's

credibility is a determination for the jury.  Tr. 826.  The appellate court summarily rejected this and other Strickland claims by stating that Petitioner had not demonstrated a reasonable probability that, but for the alleged errors, the result would have been different.  Tr. 923.  The Supreme Court of Louisiana denied writs without comment.

Counsel's statement that whether or not a witness was successfully impeached is a decision for the jury may be true, but that does not excuse a defense counsel from not engaging in reasonable cross-examination based on available information.  The question here, however, is not whether the rationale offered by defense counsel and accepted by the state court is correct.  The issue is whether the ultimate decision by the state court was an objectively reasonable application of Strickland.  A federal habeas court assesses the reasonableness of the final decision, not the state court's opinion explaining that decision. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc).

There was information contained in the police reports from which counsel could have formulated additional cross-examination.  There was inconsistency as to whether various sexual incidents were involuntary or consensual, and whether B.B. knew ahead of time that Petitioner expected sex in exchange for the drugs. There were also some other differences between B.B.'s statements to police and her trial testimony regarding the details of the events.

There will almost always be additional questions, that can be identified after trial, that counsel could have asked.  That does not, however, mean that counsel was ineffective for not

asking those questions.  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." <u>Yarborough v. Gentry</u>, 124 S. Ct. 1, 6 (2003).  And there is a strong presumption counsel acted as she did for tactical reasons rather than neglect. <u>Gentry</u>, 124 S.Ct. at 5.

In this case, counsel could have perhaps used the prior statements to point out that B.B.'s version of the facts had not been entirely consistent.  But B.B.'s testimony on direct examination had already shown that her version and sequence of the events was less than certain and affected by the fuzziness and blackouts she experienced due to drugs and the beating.  The additional questions might have cast some additional doubt on the credibility of B.B., but the issues pointed to by Petitioner are not the kind of stark inconsistencies on critical issues that give rise to a reasonable likelihood the jury would have discredited B.B. if only those questions had been asked.

Perhaps reasonable persons could disagree with this assessment, but reasonable persons would not all agree that the state court's decision was both incorrect and an objectively unreasonable application of <u>Strickland</u>.  The state court decision was, at best, debatable, but it was not unreasonable.   This was not one of the "extreme malfunctions" in the state criminal justice system that would require a habeas court to set aside the convictions.

### D.  Uncalled Witnesses

Petitioner argued in his post-conviction application that counsel was ineffective because potential character witness Daphine Hall was subpoenaed but was never called as a witness.  Tr. 776.  Petitioner did not raise this issue in his writ applications with the appellate court (Tr. 829-53) or Supreme Court of Louisiana.  Tr. 926.  He now argues in his habeas petition that counsel should have called not only Hall but six other witnesses that he alleges counsel told him would be subpoenaed for trial.

An application for a writ of habeas corpus "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  The requirement is satisfied if the federal issue has "once been properly presented to the highest court of the state" either on direct appeal or through a post-conviction application.  Sones v. Hargett, 61 F.3d 410, 415 (5th Cir. 1995).  That includes presenting the issue in a petition for certiorari to state's high court, even if that court affords only discretionary review.  O'Sullivan v. Boerckel, 119 S.Ct. 1728 (1999).  Petitioner mentioned only one witness in his trial court application, and he altogether abandoned the uncalled witness claim in the higher state courts.  Accordingly, the State is correct that this claim is barred for lack of exhaustion.

The claim also lacks merit.  To begin, Petitioner cites a letter from counsel as evidence that she agreed to subpoena his list of witnesses.  That letter, Exhibit L to the petition, describes how counsel attempted to contact one witness with information provided by

Petitioner, but the information simply did not pan out to locate the man.  Counsel did say that she attempted to contact Ms. Hall, but Hall would not return her call.  Counsel said she would issue a subpoena for Hall. It is not known whether Hall was served and appeared, or whether counsel may have decided Hall would not be a good witness.

In addition to Petitioner overstating the facts, the Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative. Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009).  "Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." Id.  In Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000), the district court granted habeas relief on a similar Strickland claim.  The Fifth Circuit reversed and faulted the district court for assuming that witnesses, from whom no affidavits were presented, would have testified favorably for the defense.

Petitioner has presented no affidavits from these witnesses.  He asserts that they would testify primarily that B.B. willingly exchanged sex for drugs and that B.B. told one witness that she and Petitioner had a fight because Petitioner caught her going through his pants pocket.  The nature of the drug/sex exchange was admitted by B.B. at trial.  And even if

Petitioner had additional evidence to back his claim that he attacked B.B. because she was trying to steal from him, that would not have been a valid defense.  The law does not allow a person to beat another person almost to death on suspicion of attempted theft.

### E.  Allowing a Jury Trial

This case was originally assigned to Judge John Mosely.  Original counsel, Michelle Andrepont, waived trial by jury.  Tr. 2.  On the date set for a bench trial, Judge Mosely discovered that he knew the victim's mother from church, so he recused himself.  The case was reassigned to Judge Emanuel, who also recused himself.  The case was then assigned to Judge Crichton.  Tr. 801, 813.  Ms. Harried, later assigned as defense counsel, conducted a jury trial before Judge Crichton.  There is no explanation on the record for the change in the form of trial, but there is also no objection on the record from Petitioner.

Petitioner argued in a supplemental post-conviction application that he never withdrew his waiver of jury trial and that Ms. Harried did not respond when he told her at trial that he did not request a jury.  Tr. 797-98.  Counsel did not address this issue in the affidavit she filed in state court.  Judge Pitman, who addressed the post-conviction application, denied the claim.  He reasoned that it was counsel's professional opinion to have a jury trial, and Petitioner had not demonstrated that the outcome of his case would have been different at a bench trial.  Tr. 827.  The appellate court denied relief with similar reasoning. Tr. 924.

Assuming the client, and not counsel, has the right to choose whether trial will be by judge or jury, Petitioner has not pointed to any record evidence to support the contention that the election of a jury trial was without his consent.  Not every discussion between client and counsel is on the record, but it is likely the change was discussed at some point.  More important, the jury selection process unfolded before Petitioner's eyes, and he has pointed to no place on the transcript where he voiced any question, surprise, or objection.  Finally, there is no doubt Petitioner would have been convicted had he waived a jury and gone to trial before Judge Crichton.  The judge commented at sentencing that Petitioner was fortunate to have received leniency from the jury who convicted him of a lesser crime of second-degree kidnapping instead of the charged crime of aggravated kidnapping that would have resulted in a mandatory life sentence.  Given the absence of any supporting evidence in the record that was before the state court, Petitioner has not met his burden of establishing deficient performance or prejudice.  The state court's decision to reject this claim was not objectively unreasonable.

**Denial of Post-Conviction Relief**

Petitioner argues that the state court's rejection of his post-conviction application was erroneous because the court did not allow him access to a free trial transcript or generally permit a fair opportunity for him to present his claims.  This claim fails because "infirmities in State habeas proceedings do not constitute grounds for relief in federal court."  Rudd v. Johnson, 256 F.3d 317, 319 (5th Cir. 2001).  See Kinsel v. Cain, 647 F.3d 265, 273 (5th Cir.

2011) ("no state habeas infirmities" rule barred habeas review of claim that state appellate court violated due process during postconviction proceedings).

**Copy of Trial Transcript**

Petitioner had appointed counsel on direct appeal who filed a brief on his behalf and raised a number of issues. Petitioner argued in his post-conviction application that his right to appellate review was nonetheless violated because he was not given a copy of his complete trial transcript so that he could prepare a pro se supplemental brief. The trial court denied this claim, reasoning that the right to appeal was protected when the trial record was supplied to appellate counsel and the appellate court reviewed the entirety of the record when it decided the case. Tr. 822-23. The appellate court agreed and added that there was no constitutional or statutory requirement that a defendant be given the trial record free of charge so that he may file a pro se supplement to counsel's appellate brief. Tr. 923.

Petitioner argues in his habeas memorandum that the denial of the transcript violated his rights under Louisiana Constitution Art. I, Section 19, which provides that no person shall be subject to imprisonment without the right of judicial review based on the complete record of all evidence on which the judgment is based. Of course, federal habeas courts may not grant relief based on Louisiana law claims.

Even if Petitioner had exhausted and presented a similar federal claim, he has not identified any clearly established federal law, as decided by the Supreme Court, that would entitle him to a free transcript for the purpose of preparing a pro se appellate brief when he

is represented by counsel.  A district court has rejected a similar habeas claim, even though counsel in that case filed only an Anders brief.  Potter v. Quarterman, 2006 WL 2168359, *10 (S.D. Tex. 2006).  See also Rosado v. Unger, 2012 WL 5871607, **9-10 (S.D. N.Y. 2012), R&R adopted, 2012 WL 5871606 (S.D. N.Y. 2012) (collecting cases holding that a defendant represented by counsel who has access to the transcript does not have a constitutional right to another free transcript for purpose of preparing a pro se supplemental brief).  Petitioner has not met his burden with respect to this final claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to

proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 30th day of July, 2014.

**Mark L. Hornsby**
**U.S. Magistrate Judge**